UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THOMAS ZMARZLY ) | CASE NO. 1:18CV157 |
| ) | |
| Plaintiff ) | MAGISTRATE JUDGE |
| ) | GEORGE J. LIMBERT |
| v. ) | |
| ) | **MEMORANDUM AND OPINION** |
| NANCY A. BERRY HILL, ) | |
| ACTING COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION ) | |
| ) | |
| ) | |
| Defendant ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Thomas Zmarzly Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his April 25, 2017 decision in finding that Plaintiff was not disabled because Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14-36). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I.  PROCEDURAL HISTORY

The Plaintiff, Thomas Zmarzly, filed an application for Supplemental Security (SSI) Benefits and Disability Insurance Benefits (DIB) on July 23, 2014, alleging disability as of August 16, 2012 (Tr. 230-237). His claims were denied initially on March 12, 2015, and upon reconsideration dated August 6, 2015 (Tr. 139-145, 151-162). Plaintiff, thereafter, filed a request for hearing on August 26, 2015 (Tr. 163-164), and a hearing was held on October 28, 2016 before an Administrative Law Judge

1

(ALJ) (Tr. 66-73), although the hearing was continued to obtain medical evidence. A supplemental hearing was held on February 6, 2017 (Tr. 37-59). The hearing was attended by Plaintiff and counsel (Tr. 37-59), and a vocational expert (VE) (Tr. 53-58).

On April 25, 2017, the ALJ issued a Notice of Decision-Unfavorable to Plaintiff. Plaintiff objected to the ALJ's decision, and filed a request for review of the hearing decision on May 3, 2017 (Tr. 227-229). This request was denied by the Appeals Council on November 20, 2017 (Tr. 1-6), leaving the decision of the ALJ as the final decision of the Commissioner. Plaintiff then filed this judicial action pursuant to 42 U.S.C. § 405(g) and 1383(c).

## II.     STATEMENT OF THE FACTS

Plaintiff was born on October 6, 1964, and, therefore, was forty-seven years old on the alleged disability onset date (Tr. 29). Plaintiff has a high school education (Tr. 30), and was found to have past relevant work as a pipefitter and a pipefitter supervisor (Tr. 53-54).

## III.    SUMMARY OF MEDICAL EVIDENCE

On February 6, 2015, Plaintiff underwent a consultative examination with Dr. Dariush Saghafi, at the request of Social Security (Tr. 322-330). On physical examination, Plaintiff was found to have "giveway weakness" in both dorsi and plantarflexion on the left foot (Tr. 327). Dr. Saghafi opined that Plaintiff more likely than not suffers from lumbago and residual vertebral body chronic degenerative disc disease, and is able to bend, walk and stand for up to fifteen minutes at a time (Tr. 325). X-ray testing revealed left knee suprapatellar effusion and small exostosis of all posterios aspect of the proximal tibia; degenerative changes of the right shoulder AC joint with calcification of the humeral head consistent with ligament, tendon, or bursa calcification; and lumbar levoscoliosis, disc space narrowing at L3-4 and L5-S1, marginal osteophytes at all levels, slight retrolisthesis of L2

2

with respet to L3 with respect to L4 and with respect to L5, and some minor degenerative changes of the thoracic spine (Tr. 332-334).

On May 20, 2015, Dr. R.B. Casselberry, Plaintiff's treating physician, wrote a detailed report concerning Plaintiff's physical condition (Tr. 336-338). Dr. Casselberry stated that he had treated Plaintiff for nearly twenty years for right shoulder arthritis, degenerative disc disease of the low back (with associated muscle spasm and sciatica into both legs), and left knee arthritis (Tr. 337). Dr. Casselberry stated that Plaintiff's right shoulder affects his mobility, strength, and pain, and interferes with his ability to work; his lumbar degenerative disc disease with sciatica affects his ability to walk, bend, lift, stoop and crawl; and his left knee pain due to arthritis affects his gait and ability to bend, lift, stoop and crawl as well (Tr. 337).

Dr. Casselberry stated that Plaintiff stopped working in August 2012 upon his advice (Tr. 337). Dr. Casselberry also stated Plaintiff was not fit to work in this or any other occupation, and at most being able to work maybe one to two hours per day (Tr. 337). Dr. Casselberry stated that Plaintiff's combined limitations relating to his shoulder, back and both knees affect work as follows: Dr. Casselberry opined that Plaintiff can occasionally lift/carry up to ten pounds, but never anything more than fifteen pounds; sit/stand or walk for no longer than one hour; no pushing/pulling more than ten pounds; and no bending, squatting, kneeling, twisting, running, or climbing without risk for serious injury to himself and co-workers (Tr. 337-338). Further, Dr. Casselberry noted that Plaintiff had frequent issues in a work setting with maintaining concentration for extended periods, maintaining regular attendance and being punctual, and with relating to co-workers and interacting with supervisors (Tr. 337-338).

Dr. Casselberry stated that the right shoulder prevents him from wrenching, and his left knee prevents the operation of foot controls (Tr. 337). Dr. Casselberry noted physical findings of: pain

3

and crepitus of the right shoulder rated a 6/10; loss of the normal lumbar curvature, spasms in the muscles bilaterally with moderate decreased range of motion; and audible cracking and popping of the left knee with medial and lateral instability (Tr. 337).

On August 14, 2015, Plaintiff sought emergency room care at Parma Hospital, due to right shoulder pain (Tr. 340). Physical examination revealed tenderness to palpation (Tr. 340), and x-ray testing showed degenerative joint changes, including AC joint narrowing and hypertrophic changes, as well as glenohumeral osteophytes, and he was given a Toradol injection (Tr. 341-342).

Dr. Casselberry's treatment notes from January 2013 through December 2016 (Tr. 367-433), indicate the shoulder, back and knee limitations, as well as consistent complaints of pain. Initially, in August 2012, Plaintiff was diagnosed with degenerative disc disease and left knee pain secondary to internal derangement, and was given prescriptions for Oxycodone 15 mg and Valium 10 m g (Tr. 429). On January 9, 2013, Plaintiff was prescribed Oxycodone 15 mg and Valium 10 mg (Tr. 420). On February 6, 2013, Plaintiff complained of lower back pain, bilateral leg/knee pain, and numbness in his toes (Tr. 419). In March of 2013, Plaintiff stated that his feet were feeling numb, especially his toes (Tr. 418). On July 10, 2013, Plaintiff wrote Dr. Casselberry a note, stating that the numbness in his legs and muscle spasms were getting worse (Tr. 424). In October 2013, Plaintiff told Dr. Casselberry that his insurance should be back within the next week, and that he had progressive numbness in his right leg, bad spasms, and pain shooting down both of his legs (Tr. 427). One month later, in November of 2013, Plaintiff stated that he has no insurance, and that the cold weather worsens his pain (Tr. 407).

In December of 2013, Plaintiff stated that he has shoulder spasms and numbness in his bilateral toes (Tr. 406). In February 2014, Plaintiff complained of lower back spasms down his bilateral legs and left foot numbness, worse with the cold and dampness (Tr. 404). From April

4

through May 2014, Plaintiff continued to complain of bilateral leg pain (Tr. 402-403). In May and June 2014, Plaintiff complained of leg pain, and stated that his left knee "gives out" and gets "locked up" (Tr. 400-401). In August 2014, Plaintiff stated that his left knee pain was "real bad," and complained of numbness in his left foot and pain across his lower back and down his bilateral legs (Tr. 398). In September 2014, in addition to complaints of leg and back pain, Plaintiff stated there was "something going on with his right shoulder" (Tr. 397). In November 2014, Plaintiff again noted that his left leg "gives out" (Tr. 396).

In January of 2015, Plaintiff was found to have clicking and crepitus of the right shoulder, loss of lumbar lordosis, bilateral spasm, left knee crepitus, and medial meniscus tenderness, and was diagnosed with degenerative disc disease and osteoarthritis of the right shoulder and left knee (Tr. 394). On February 6, 2015, Plaintiff was prescribed Robaxin 500mg and Oycodone 15mg (Tr. 393). In March 2015, Plaintiff was found to have loss of lordosis of the back, bilateral spasm L3-L5 erector spine muscles, decreased range of motion, crepitus of the right shoulder with reduced range of motion, and bilateral crepitus of the knees with range of motion (Tr. 392). Plaintiff was advised to get MRI's of the right shoulder, low back and knees, and was given an increase of Robaxin to 750mg, and a new prescription for Trazadone 50mg (Tr. 391-392). In April 2015, Plaintiff had similar physical findings, and was given an increase in Trazadone to 100mg (Tr. 390).

In May of 2015, Plaintiff was found to have crepitus with range of motion of the right shoulder, medial and lateral instability of the left knee with crepitus, and right knee crepitus (Tr. 389). In July of 2015, Plaintiff stated that his right shoulder pops in and out of place three to four times daily (Tr. 384). Physical examination revealed audible popping with range of motion of the right shoulder (Tr. 384). In August of 2015, Plaintiff complained that his right shoulder "was on fire," and it was noted that he was still awaiting approval of the MRI of his right shoulder (Tr. 383). Physical

5

examination revealed a right grip strength of 2/5 and left of 3/5 (Tr. 383).

From January through October in 2016, Plaintiff continued to complain of right shoulder, left knee and low back pain, worse with physical activity (Tr. 368-369, 371-378). In August of 2016, Plaintiff wanted to follow up on having testing performed on his right shoulder, noting that it was much weaker than his left (Tr. 370). Further, Plaintiff was given an increase of Trazadone to 150mg, due to increased trouble sleeping (Tr. 368).

On November 1, 2016, Plaintiff underwent a psychiatric assessment at the Center for Families and Children, due to anxiety, depression, fatigue and insomnia, and was diagnosed with major depressive disorder (Tr. 437, 439). Plaintiff was prescribed Zoloft 12.5mg to 75mg (Tr. 443). On November 29, 2016, Plaintiff reported improvement with Zoloft, but continued to report anxiety and was irritable and dismissive (Tr. 444).

**IV.    SUMMARY OF TESTIMONY**

Plaintiff testified that he became unable to work as of his onset date of August 16, 2012, because he was unable to perform his job up to expectations (Tr. 40, 46). Plaintiff testified taht he had back pain and bilateral shoulder and knee pain, especially with the left knee (Tr. 40). He has since developed anxiety and depression, due to being unable to go to work (Tr. 41).

Plaintiff stated that he was unable to lift his right dominant arm above his head and had about fifty percent strength (Tr. 42, 50). Plaintiff said that his left knee pops and cracks and feels like it is going to "give out" on him (Tr. 42). Plaintiff testified that he can stand only twenty minutes, due to his knees locking, stiffness, numbness, and muscle spasms in his knees and numbness in his feet; he can walk maybe one and a half city blocks before needing to take a break; and can lift maybe twenty pounds (Tr. 46, 48-50). Plaintiff stated that he spends ninety percent of his day sitting and sometimes laying down, due to his pain (Tr. 51). In addition, Plaintiff testified that he could not be on his feet

6

for a majority of the day (Tr. 52).

Plaintiff has been treated with manipulations, medications, acupuncture, heating packs, and a tens unit he has used at least once daily since 1998 on both his back and shoulders, with some relief (Tr. 42-43, 49, 51-52). Plaintiff testified that some doctors have told him that he needs surgery (Tr. 49), but having no insurance has prevented him from receiving psychiatric counseling and has caused problems having an MRI performed (Tr. 41, 43). Plaintiff testified that his physician for these problems has been Dr. Casselberry, whom he has been treating with since 1996 and visits approximately every twenty-eight days (Tr. 49).

The VE testified that Plaintiff has past relevant work as a pipefitter and a pipefitter supervisor (Tr. 53). The VE testified that Plaintiff's past relevant work did not have transferable skills to the sedentary or light level of exertion (Tr. 54). When asked to consider an individual of Plaintiff's age, education and work experience limited to: lifting/carrying/pushing/pulling ten pounds with the upper and lower extremities; occasionally kneeling, squatting, stooping, crouching, crawling; and standing/sitting/walking limited to one hour at a time for a maximum of six hours in an eight-hour workday, the VE testified that there would be only sedentary jobs that Plaintiff could perform (Tr. 57). Further, the VE testified that if Plaintiff needed to take two additional fifteen minute breaks per day, there would be no work he could perform at any exertional level (Tr. 57-58).

## V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits and supplemental security income. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be

7

        found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3.     If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *See* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4.     If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5.     If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See,*

*Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

**VII.   ANALYSIS**

Plaintiff asserts one assignment of error:

WHETHER THE ALJ ERRED IN THE WEIGHT ASSIGNED TO THE OPINION OF TREATING PHYSICIAN DR. CASSELBERRY.

A.   The ALJ Properly Accorded Partial Weight to the Opinion of Dr. Casselberry.

Plaintiff argues that the ALJ should have accorded controlling weight rather than partial weight to the opinion of Dr. Casselberry. *See* Pl.'s Br. at 9-13. Pursuant to the regulations, a treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997). The Sixth Circuit has held that treating physician opinions "are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence." *Cutlip v. Sec'y of H.H.S.*, 25 F3rd 284, 287 (6th Cir. 1994). In determining the weight of medical-source opinions not entitled to controlling weight, an ALJ considers the following factors: the length, nature and extent of treatment relationship; evidence in support of the opinion; consistency with the record

9

as a whole; and the physician's specialization. *See* 20 C.F.R. § 404.1527(c)(2); *Ealy v. Comm'r of Soc. Sec.*, 594 F3d 504, 514 (6th Cir. 2010).

On May 20, 2015, Dr. Casselberry issued a letter, noting he had treated Plaintiff for twenty years for conditions, including arthritis of the right shoulder, degenerative disc disease of the lumbar spine with spasms with sciatica into both legs, and left knee arthritis (Tr. 28, 337), 387-388). He claimed that Plaintiff stopped working in August 2012 under his advice (though Plaintiff said he was laid off (Tr. 287)) (Tr. 28, 337). He opined Plaintiff could work potentially one to two hours per day, could occasionally lift or carry up to ten pounds, but never anything over fifteen pounds; could sit, walk, or stand no longer than one hour; and could not perform foot controls with the left knee, engage in wrenching with the right shoulder, or push or pull over ten pounds (Tr. 28, 337-338). He indicated that any activity requiring bending, squatting, kneeling, twisting, turning, or climbing will put him at risk for serious injuries and his co-workers working in teams as well (Tr. 28, 338). Dr. Casselberry noted Plaintiff is able to take care of himself in regard to activities of daily living; however, he noted that in a work setting, Plaintiff had frequent difficulties maintaining concentration for extended periods, maintaining regular attendance and being punctual, relating to co-workers, and interacting with supervisors (Tr. 28, 338).

The ALJ correctly found that Dr. Casselberry's opinion was inconsistent with the medical record, including Dr. Casselberry's treatment notes (Tr. 23-29, 367-433). Dr. Casselberry's treatment records largely contained only Plaintiff's subjective complaints (Tr. 23, 25-29, 393, 368, 369, 370-382, 385-386, 395-429, 431-433). When he examined Plaintiff, findings were as follows: Plaintiff had right shoulder crepitus with range of motion (ROM) and mildly decreased ROM; left knee crepitus with ROM; and loss of lumbar lordosis, lumbar spasm, and decreased lumbar ROM (Tr. 23-29, 383-384, 389-390, 392, 394). However, it should be noted that Plaintiff did not have a primary-care

10

physician, and Dr. Casselberry did not recommend more aggressive treatment or refer Plaintiff for a surgical evaluation (Tr. 27. 367-433).

Furthermore, Dr. Casselberry's opinion was inconsistent with other medical evidence (Tr. 23-29). At the consultative examination, the physical examination was normal (Tr. 23-24, 324-329). *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175-76 (6th Circ. 2009) ("Where the opinion of a treating physician is . . . inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion."). Similarly, the examination findings at Parma Medical Center were minimal–tenderness to palpation of the right shoulder, but full shoulder ROM, intact right grip strength, normal pulses, and a normal gait with independent ambulation (Tr. 24, 340, 346). After undergoing an x-ray, doctors assessed only arthralgia (Tr. 24, 341, 352).

Dr. Casselberry's opinion was inconsistent also with diagnostic imaging (Tr. 24, 26-29, 331-335). *See* Pl.'s Br. at 11-12. An x-ray of the left knee performed on March 10, 2015 revealed normal bony architecture and density, no acute fracture or dislocation, a small suprapatellar effusion (accumulation of fluid), small benign growth (exotosis) of the posterior aspect of the proximal tibia, and intact joint spaces without significant arthritis changes (Tr. 24, 332). An x-ray of the right shoulder showed minor degenerative changes of the acromioclavicular (AC) joint; small calcifications in a few locations; and the glenohumeral joint and subacromial space were maintained (Tr. 24, 333). An x-ray of the lumbar spine showed lumbar levoscoliosis (left curvature) and degenerative changes, including the disc space narrowing at L5-S1 and minimally at L3-4; marginal osteophytes at all levels; evidence of slight retrolisthesis (posterior displacement) of L2-L5; some possible sclerosis (hardening) of the sacroiliac (SI) joints, which were maintained; and minor degenerative changes of the thoracic spine (Tr. 24, 334).

The ALJ also correctly noted that Plaintiff's activities of daily living were inconsistent with Dr. Casselberry's opinion (Tr. 21, 23, 26-27). *Shepard v. Comm'r of Soc. Sec.*, 705 F.App'x 435 (6th Circ. 2017) ("It was entirely appropriate for the ALJ to consider whether Shepard's asserted limitations were consistent with her ability to drive, prepare simple meals, shop, and go to eat or the movies."). Plaintiff admitted to Dr. Casselberry that his medications were effective (Tr. 23, 369, 370, 372, 373, 376, 381, 382, 385, 389, 395, 399, 400, 402, 403, 405-409, 411-419, 431, 432). He also testified that medications helped "tremendously" (Tr. 52). Plaintiff lived alone in a duplex (Tr. 23, 47). He described normal daily activities–he washed his face, drank coffee, watched the news, did light loads of laundry, prepared dinner, attended counseling appointments, read, and relaxed around the house (Tr. 21, 23, 26-27, 43-44). He confirmed that he could cook; shop for groceries; drive, and use public transportation, as he traveled to the hearing by bus (Tr. 21, 23, 26-27, 52). At the hearing, he testified that he could lift about twenty pounds (though Dr. Casselberry stated that he should never lift more than fifteen pounds (Tr. 21, 23, 26-27, 45, 337-338). In addition, Plaintiff advised the consultative examiner that he lived alone and did all of his own chores (Tr. 27, 323). Furthermore, Dr. Casselberry noted that Plaintiff could perform his activities of daily living, and Plaintiff repeatedly advised Dr. Casselberry that he could perform his activities of daily living without describing any difficulties (Tr. 23, 338, 369, 370, 372, 373, 376, 381, 382, 385, 431, 432). Therefore, the ALJ correctly found that Plaintiff's activities of daily living were inconsistent with Dr. Casselberry's extreme limitations.

Here, Plaintiff contends that an MRI would substantiate his subjective allegations; however, he underwent diagnostic testing (x-rays), and the findings were minimal and examination findings were minimal or normal (Tr. 23-29, 42-43, 322-335, 339-433. Furthermore, the record shows that Plaintiff obtained and received the treatment he desired–namely, narcotics and benzodiazepines (Tr.

12

23-29, 366-433).

Plaintiff argues that the ALJ's decision is unsupported by the evidentiary record. *See* Pl.'s Br. at 13. In support of this argument, Plaintiff contends that the ALJ improperly inferred that Plaintiff could lift twenty pounds because he testified that he could lift a half-full laundry basket. *See id.* Plaintiff argues that a laundry basket "doubtfully weigh[s] twenty pounds." *See id.* However, the ALJ noted Plaintiff's testimony that he could lift twenty pounds (Tr. 23, 29).

The ALJ relied upon Plaintiff's specific testimony that he could lift his half-full laundry baskets that weighed twenty pounds (Tr. 23, 29, 45).

Plaintiff also notes that, on one occasion, Dr. Casselberry noted decreased grip strength. *See* Pl.'s Br. at 11 (citing Tr. 383). However, neither Dr. Casselberry nor any other provider documented decreased grip strength on any other occasion, and other medical records fully supported the ALJ's finding that Plaintiff retained full extremity and grip strength (Tr. 20, 24-26, 28, 29, 324-329, 340, 346, 354); normal sensation (Tr. 20, 24-26, 28, 29, 324-329, 346, 360); and a normal gait with independent ambulation (Tr. 20, 24-26, 28, 29, 325, 346, 360). Nevertheless, Dr. Casselberry did not opine that Plaintiff had any limitations with regard to grip strength (Tr. 28, 337-338).

Plaintiff contends that the ALJ failed to provide good reasons for partially discounting Dr. Casselberry's opinion. *See* Pl.'s Br. at 11. The ALJ thoroughly analyzed the record, which included consideration of Dr. Casselberry's specialty of pain management, the frequency of their appointments since treatment began twenty years ago, that Dr. Casselberry's was not consistent with or supported by the record, that his findings were minimal, and Plaintiff reported improvement with medication (Tr. 23-29, 367-433). *See Cutlip v. Sec'y of H.H.S.*, 25 F3rd 284, 287 (6th Cir. 1994) (Treating physician opinions "are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence.") The Court finds that the ALJ provided good reasons for according Dr. Casselberry's opinion less than controlling weight. Therefore, the ALJ properly weighed Dr.

Casselberry's opinion, and the Court finds that substantial evidence supported the ALJ's finding.

Here, the RFC included appropriate work-related limitations that were supported by the record as a whole, including diagnostic studies, physical-examination findings, Plaintiff's treatment course, and State-agency medical expert opinion. Hence, the Court finds that substantial evidence supported the ALJ's RFC and finding that Plaintiff was not disabled.

## **VIII. CONCLUSION**

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform a significant number of jobs that exist in the national economy, and, therefore, was not disabled. Hence, he is not entitled to DIB and SSI.

Dated: February 1, 2019      */s/George J. Limbert*
                              GEORGE J. LIMBERT
                              UNITED STATES MAGISTRATE JUDGE